UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Huff, Judges Alston and Russell
Argued by teleconference

COMMONWEALTH OF VIRGINIA

v.      Record No. 1452-17-4

KYLE EMERSON YEN

MEMORANDUM OPINION[*] BY
JUDGE WESLEY G. RUSSELL, JR.
JANUARY 23, 2018

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

David M. Uberman, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellant.

Zachary A. Deubler (Whitestone Young, P.C., on brief), for
appellee.


Kyle Emerson Yen was indicted for violating Code § 18.2-250 for his possession of cocaine

that was discovered after a traffic stop. In the proceedings below, Yen sought to suppress the

cocaine that was found, arguing that the search of his person that led to its discovery violated the

Fourth Amendment. The circuit court granted Yen's motion to suppress, and the Commonwealth,

pursuant to Code § 19.2-398(A)(2), appeals that ruling. For the reasons that follow, we reverse the

circuit court's ruling and remand the matter for further proceedings consistent with this opinion.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

Around 10:00 p.m. on July 4, 2016, Officer Michael Valentin, with activated lights, initiated a traffic stop of Yen's vehicle after Yen disregarded a red traffic light and proceeded through an intersection. When Valentin knocked on Yen's window, Yen jumped and let out a muffled scream. Valentin described the encounter as follows: "During our initial contact, I observed the driver to be fidgety, twitchy, and sweating." Valentin asked Yen where he was going and asked about Yen's driving and criminal records. Yen answered the officer's questions and informed him that his passenger had been drinking and that they were headed to a bar. Valentin obtained Yen's driver's license and registration and returned to his police cruiser.

In the police cruiser, Valentin initiated a driver's transcript check and a criminal records check. He also requested "backup."

While Valentin was conducting the transcript and records check, the backup officer arrived. The backup officer parked behind Valentin and approached Yen's passenger. The backup officer informed Valentin that he was familiar with the passenger from a prior encounter. The backup officer told Valentin that he had observed the passenger attempt to dispose of a bag of marijuana. Ultimately, the passenger was charged with possession of marijuana.

Valentin completed the transcript and records checks. There were no outstanding warrants for Yen's arrest, and Valentin characterized Yen's driving record as "fair." Valentin decided to issue a "warning ticket" for the red light infraction.

Valentin left his police cruiser and approached Yen's vehicle. He detected the odor of alcohol coming from the vehicle and asked Yen to step out of the vehicle. Valentin explained that

---

[1] The parties submitted the matter to the circuit court based upon stipulations and the transcript of testimony from the arresting officer, Officer Valentin, at the preliminary hearing. As a result, Yen concedes on brief that "the facts are not in dispute on appeal." Accordingly, we recite the facts as reflected by the parties' stipulations and in the preliminary hearing testimony of Officer Valentin, accepting the stipulations and testimony as true.

when he detects an odor of alcohol from a car containing more than one person, he "separate[s] the driver from the other occupant[]" to enable him to determine if the odor of alcohol is coming from the driver.

Yen got out of the vehicle, and Valentin returned his license and registration. Valentin then issued the warning ticket for the red light infraction and asked Yen if he had consumed any alcoholic beverages that day. Yen responded that he had consumed a beer approximately thirty minutes before Valentin had stopped him.

Valentin asked if Yen would perform field sobriety tests. Yen agreed and performed multiple tests. Valentin indicated that Yen performed sufficiently well on the tests that he did not have a basis for charging Yen with driving under the influence. When Yen's counsel eventually questioned Valentin regarding what Valentin communicated to Yen once the field sobriety tests were completed, the following colloquy occurred:

> Counsel: Before you asked him if he would consent to the search of the vehicle, did you tell him he was free to leave?
>
> Valentin: Forgive me. Yes. I told Mr. Yen that I had concluded my tests; we weren't going to have him attempt anymore; I did not believe that he was intoxicated.
>
> Counsel: All right. But you didn't tell him, with the words I used, You're free to leave; you can go?
>
> Valentin: Not to my memory. At that time he had had his license and he was issued a warning ticket for the initial infraction . . . and I told him verbally that the evaluation for DUI was over.
>
> Counsel: All right. You've had an opportunity to look at your notes of the offense or your report of what happened; is that correct?
>
> Valentin: Yes.

- 3 -

Counsel:      Would you agree that there is nothing in your notes that reflect that you told him he was free to leave?

Valentin:      I would say that's correct.[2]

After completing the DUI investigation, Valentin asked Yen to consent to a search of his vehicle. Yen assented to the search of the vehicle. Before beginning a search of the vehicle, Valentin asked Yen if he had any weapons. Yen responded that he did not have any weapons, and Valentin then asked Yen to raise his shirt.

Yen raised his shirt, revealing a plastic bag containing a white powder. Valentin testified that, based on his training and experience, he believed the bag contained "an eight ball of cocaine." He informed Yen he was being detained so that he could investigate Yen's possible possession of narcotics. Valentin placed Yen in handcuffs and read him <u>Miranda</u> warnings. Yen confirmed that the substance in the bag was cocaine.

Valentin testified that Yen's initial nervousness made him suspicious that Yen possessed illegal drugs. He conceded, however, that he did not have a particular drug or crime in mind. He also conceded that he did not have a reason to believe Yen was armed when he asked if Yen had a weapon, but that he asked the question to ensure his safety during his planned search of the vehicle.

Yen filed a motion to suppress the cocaine; citing <u>Rodriguez v. United States</u>, 135 S. Ct. 1609 (2015), Yen argued that the stop and resulting detention, although initially valid, became unlawful because it was "prolonged beyond the time reasonably required to complete the mission at hand." Specifically, Yen contended that the police "did initiate a lawful stop," but "that stop legally ended when Officer Valentin[] made this determination that there was insufficient proof for a DUI."

---

[2] Although Valentin answered "yes" in responding to the question of whether he told Yen he was free to leave, the remainder of his testimony strongly suggests that, although he told Yen many things, Valentin never used words to the effect that Yen was "free to go." Because we view the evidence in the light most favorable to Yen as the prevailing party below, see <u>Bland v. Commonwealth</u>, 66 Va. App. 405, 412, 785 S.E.2d 798, 801 (2016), we proceed with the understanding that Valentin never expressly told Yen he was free to go.

Yen argued that Valentin lacked reasonable suspicion to extend the detention to search the car or Yen and that, in light of the totality of the circumstances, his consent to the search of his person and car was invalid.

In response, the Commonwealth argued that the detention of Yen to allow investigation of both the initial traffic infraction and the suspicion of DUI was clearly lawful, but ended when Valentin informed Yen that "the evaluation for DUI was over." According to the Commonwealth, the interactions from that point forward, including the search of Yen's person, were consensual, and thus, did not implicate the Fourth Amendment. The Commonwealth maintained that Rodriguez was easily distinguishable because Rodriguez had refused to consent to the subject search and was detained to allow the non-consensual search to occur. Alternatively, the Commonwealth contended that Valentin had reasonable articulable suspicion that Yen may have possessed illegal drugs based upon Yen's nervous reaction when Valentin first approached the car.

The circuit court heard the motion to suppress on August 18, 2017. As noted above, no *ore tenus* evidence was presented; the parties stipulated to the evidence, including the preliminary hearing testimony of Valentin.

From the bench, the circuit court initially denied the motion to suppress, but nevertheless reserved final judgment, stating that it would "take this afternoon to reread" the cases submitted by the parties and inform the parties if it reconsidered its decision. The circuit court determined that the question was "should the officer have not asked that one additional series of questions after being satisfied in his mind that the offense[s] that he believed the defendant had committed, the defendant [in fact] had not committed. So does [the officer] have an obligation to really shut down and pack up his gear and vacate the scene or can he do one more question[?]"

Later, "upon a closer examination of the transcript" and contrary to its earlier decision, the circuit court entered an order granting Yen's motion to suppress. In reconsidering the issue, the

- 5 -

circuit court noted that the issue presented was "whether the discovery of contraband on the defendant's person resulted from a consensual search, or alternatively, was supported by reasonable suspicion."

The circuit court found that the search was not consensual. Citing Ohio v. Robinette, 519 U.S. 33 (1996), the circuit court stated that, "following a lawful traffic stop, a police officer may engage in additional questioning as long as the continued encounter is consensual[,]" but found that under the circumstances of this case "a reasonable person would not feel that he was free to leave when the request for the search of the car was made." In making this decision, the circuit court referenced "[t]he fact that [Yen] was still engaged in conversation with the officer, the presence of the back-up officers and the absence of a clear directive from the officer that the defendant was free to leave[.]"[3]

In addition, the circuit court explicitly found that "the fact that [Yen] emitted a muffled scream when first approached by the officer, who had knocked on the car's window . . . and [Yen's] being sweaty, fidg[e]ty and twitchy does not provide sufficient reasonable suspicion to conduct a pat down." Finding that the suspicious behavior mostly appeared in connection with the initial stop, the circuit court further concluded that, "[t]he officer's subsequent interaction did not produce any additional evidence except for the absence of sufficient cause to believe [Yen] was intoxicated." In summary, the circuit court stated, "[f]or reasonable suspicion to exist, more than nervousness must be present. While an officer may rely on escalating information, the absence of positive evidence is not the equivalent of the additional information that would support a Terry search after a traffic stop had been concluded."

---

[3] Although the circuit court's order refers to the presence of "back-up officers," the record reveals the presence of only one backup officer. Yen conceded at oral argument in this Court that only one backup officer was present.

Ultimately, by order dated August 18, 2016, the circuit court granted Yen's motion to suppress and this appeal followed. On appeal, the Commonwealth contends that

> I. The [c]ircuit [c]ourt's holding that[ ] "[a]fter a significant period of detention, an officer must do more than inform a defendant that he is not being charged with an offense" is plainly wrong and is unsupported by the Fourth Amendment of the Constitution. The [circuit] court erred as a matter of law when it concluded that "after a significant period of detention, an officer must do more than inform a defendant that he is not being charged with an offense." The Supreme Court of the United States and the Supreme Court of Virginia have expressly rejected such an approach.
>
> II. The [c]ircuit [c]ourt erred in granting the defendant's motion to suppress and in finding that a reasonable person in the defendant's position would not have felt free to leave because its finding relied on an erroneous finding of fact and did not account for the totality of the circumstances. The [circuit] court erred in concluding that a reasonable person in Yen's position would not have felt free to leave, as it failed to consider the totality of the circumstances and relied, in part, upon an erroneous finding of fact.

ANALYSIS[4]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Generally, searches conducted without a warrant are *per se* unreasonable and, therefore, unlawful under the fourth amendment." Commonwealth v. Ealy, 12 Va. App. 744, 751, 407 S.E.2d 681, 686 (1991) (quoting Derr v. Commonwealth, 6 Va. App. 215, 219, 368 S.E.2d 916, 918 (1988)); accord Katz v. United States, 389 U.S. 347, 357 (1967). Accordingly, "[a] warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement . . . ." Flippo v. West Virginia, 528 U.S. 11, 14 (1999) (citing Katz, 389 U.S. at 357).

---

[4] On appeal, the Commonwealth does not challenge the circuit court's determination that Valentin lacked reasonable articulable suspicion to search either the vehicle or Yen once the investigation for DUI had been completed. Accordingly, our review is limited to the issue of whether Yen's consent to the search of his car and person was valid.

Searches conducted with a person's consent are such an exception. We repeatedly have recognized "the general rule that a search authorized by consent is wholly valid." Matthews v. Commonwealth, 65 Va. App. 334, 342, 778 S.E.2d 122, 126 (2015) (internal quotation marks and citations omitted). A search conducted with a person's consent is invalid "if it is involuntary, or is the product of a manipulative 'exploitation' by the police of an earlier unconstitutional search or seizure." Id. (internal quotation marks and citations omitted).

Here, it is undisputed that Yen "consented" to the search. When Valentin asked Yen if he would consent to a search of his vehicle, Yen said yes. When Valentin asked Yen to raise his shirt, Yen did so, indicating his consent. The issue before the circuit court and before us on appeal is whether Yen was subject to an impermissible seizure when he consented, rendering his consent involuntary, and hence, invalid.

The parties agree that, if, at the time he consented to the search, Yen was no longer seized, his consent was valid under these circumstances. The parties also agree that, if, at the time he consented to the search, Yen remained subject to a seizure, his consent, and hence the subsequent search, was invalid. Cf. Florida v. Royer, 460 U.S. 491, 501 (1983) (recognizing that "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will").

We apply a *de novo* standard of review in determining "whether a person has been seized in violation of the Fourth Amendment." Harris v. Commonwealth, 266 Va. 28, 32, 581 S.E.2d 206, 209 (2003). In conducting such review, we defer to the circuit court's finding of historical fact. Id. Here, however, the parties stipulated to the evidence below and agree that there are no facts in dispute. Accordingly, the circuit court did not make factual findings to which we must

defer, but rather, addressed the legal question of whether, given the undisputed facts, Yen was "seized" when he consented to the search.[5]

The Commonwealth agrees with Yen that he was seized for Fourth Amendment purposes when Valentin pulled him over for the red light infraction and when Valentin conducted his DUI investigation. Where the Commonwealth and Yen differ is whether the seizure ended before Yen consented to the search of his person.

Consistent with the Fourth Amendment, a police officer's interaction with a citizen that begins with a seizure can evolve into a consensual encounter. Ohio v. Robinette, 519 U.S. 33 (1996). In Robinette, an officer pulled Robinette over for speeding and demanded Robinette's driver's license. Id. at 36. After taking the license from Robinette, the officer returned to his patrol car and ran a records check, which revealed that Robinette had no prior violations. Id. The officer then returned to Robinette's car and asked him to step out of the car. Id. Robinette complied, and the officer returned Robinette's license and issued a warning for speeding. Id. The officer then said: "'One question before you get gone: Are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?'" Id. After Robinette responded in the negative, the officer asked for consent to search the car, which Robinette granted. Id. The resultant search led to the discovery of illegal drugs. Id.

Robinette moved to suppress the drugs found in the car, arguing that his consent was invalid. The Ohio Supreme Court agreed, holding that, before an encounter that begins with a seizure can evolve into a consensual encounter, constitutional guarantees "require[] that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go

---

[5] The closest that the circuit court came to making a factual determination was its statement that it "assumed no issue with [the] credibility" of Valentin. Given this and the parties' stipulations regarding Valentin's testimony, Valentin's testimony must be accepted as true for purposes of this appeal.

after a valid detention, before an officer attempts to engage in a consensual interrogation." Id. (citation omitted). The Ohio Supreme Court went on to hold that, once an officer has completed the investigation for which he validly has seized someone, "'[a]ny attempt at consensual interrogation must be preceded by the phrase "At this time you legally are free to go" or by words of similar import.'" Id. (citation omitted).

The United States Supreme Court reversed, rejecting a reading of the Fourth Amendment that required such a "*per se* rule." Id. at 39-40. The United States Supreme Court reasoned that it was "unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary" and held that the "Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances." Id. at 40 (internal quotation marks and citation omitted).

This facts and circumstances approach to whether a reasonable person would feel free to leave after an initial, lawful seizure can be difficult to apply. The two Virginia cases most like the instant case regarding whether an initial seizure has evolved to a consensual encounter demonstrate the difficulty. Although decided on the same day, our Supreme Court reached different results in each case.

In Harris, a police officer initiated a stop of the truck Harris was driving because the truck had a broken license plate light. 266 Va. at 30, 581 S.E.2d at 208. Harris had a passenger with him. Shortly after the truck was stopped, a second police officer arrived on the scene. Id.

The officer asked for Harris' driver's license and the vehicle registration. Id. Harris told the officer that he knew the truck had been stopped for the broken license plate light, but did not produce a driver's license; instead, he gave the officer his social security card. Id.

- 10 -

The officer instructed Harris to get out of the truck and asked him questions to verify Harris' identity. Id. Using a hand-held radio, the officer confirmed Harris' identity and that, although Harris did not have it with him, Harris had a valid driver's license. Id. The officer returned the social security card to Harris. Id. at 31, 581 S.E.2d at 208.

"The officer then asked Harris if he had anything illegal in the truck or on his person. Harris replied that he did not." Id. The officer then asked Harris if he could search the truck, and Harris consented. The officer performed a pat down of Harris and then placed him in the patrol car, while the truck's passenger was removed from the truck and told to stand next to the patrol car. Id. In the resulting search, the officer "found several stolen items," which led to Harris being charged with "two counts of grand larceny." Id.

The officer conceded that, at the time, he asked for Harris' consent to search the truck, "he had no reasonable articulable suspicion that either Harris or his passenger 'had done anything illegal'" other than the potential traffic offenses. Id. The officer testified he had decided not to cite Harris for a traffic infraction "and that Harris was free to go." Prior to asking for consent to search the truck, the officer did not inform Harris that he would not be cited for a traffic offense or that he was free to go. Id.

Harris moved to suppress the items discovered as a result of the search, arguing that his consent was invalid because it stemmed from his illegal detention. Id. at 31, 518 S.E.2d at 208-09. The trial court found the search lawful, concluding that Harris' consent had been obtained appropriately. Id. at 31, 518 S.E.2d at 209. Harris then appealed that finding. Id.

In applying the facts and circumstances test, the Supreme Court recognized that

> [v]arious factors have been identified as relevant in determining
> whether a seizure has occurred, including the threatening presence
> of a number of police officers, the display of weapons by officers,
> physical contact between an officer and a citizen, an officer's
> language or tone of voice compelling compliance, the retention of

documents requested by an officer, and whether a citizen was told that he or she was free to leave.

Id. at 32, 581 S.E.2d at 209.

After reviewing all of the factors, the Supreme Court determined "that a reasonable person would not have known that the investigation of the traffic offense had terminated and, thus, would not have felt free to disregard the officer's questions or have felt free to leave." Id. at 33, 581 S.E.2d at 210. Accordingly, the Supreme Court concluded that when the officer "began questioning Harris about possession of contraband, the encounter was not consensual and Harris was seized for purposes of the Fourth Amendment . . ." and that the evidence should have been suppressed. Id. Central to the Supreme Court's conclusion was that "Harris knew he had committed a traffic violation and knew he had not complied with the officer's request for his driver's license and vehicle registration" and "[t]he officer did nothing to indicate to Harris that he was no longer subject to detention for a traffic violation." Id.

On the same day, the Supreme Court decided Dickerson v. Commonwealth, 266 Va. 14, 581 S.E.2d 195 (2003), finding that Dickerson's consent to search that was obtained after he had been stopped for a traffic violation was valid because a reasonable person in his position would have felt free to go. Specifically, a law enforcement officer initiated a traffic stop of the vehicle Dickerson was driving for speeding and failure to yield the right of way. Id. at 16, 581 S.E.2d at 196. After the initial stop, a second officer arrived and parked his car behind the first officer's vehicle. Id.

When the first officer approached Dickerson's vehicle, he detected an odor of alcohol emanating from Dickerson. Id. As a result, the officer had Dickerson step out of the car and perform field sobriety tests. Id. After the tests had been completed, the officer decided not to charge Dickerson with an alcohol related offense and informed Dickerson that he was free to go, but that he might be subpoenaed for his previous failure to yield the right of way. Id.

As Dickerson began getting back into his car, the officer asked if there was anything in the car the officer should know about, including drugs.  Id.  When Dickerson responded that there was not, the officer asked Dickerson if he smoked marijuana.  Id.  Dickerson responded that he did, but not while he was driving; Dickerson then volunteered that there were some "roaches" in the car's ashtray.  Id.

Although Dickerson refused to consent to a search of the car, he provided the contents of the ashtray to the officer and identified the contents as used marijuana cigarettes.  Id.  A subsequent search of the car led to the discovery of "three plastic bags of cocaine and a plastic box containing scales under the driver's side floormat . . . [and] several additional plastic bags of cocaine and another set of scales" in the trunk.  Id. at 17, 581 S.E.2d at 196.

Charged with possession of cocaine with the intent to distribute, Dickerson moved to suppress the evidence recovered from the search of his car, arguing that his apparently voluntary act of providing the marijuana cigarettes from the car's ashtray to the officer stemmed from the officer's impermissible questioning of him after the purpose of the initial seizure, the traffic stop, had dissipated.  Id. at 17, 581 S.E.2d at 196-97.  According to Dickerson, a reasonable person in his position would not have felt free to go, and therefore, his apparently voluntary action was the involuntary result of the continuation of his seizure in violation of his Fourth Amendment rights.  Id. at 17-18, 581 S.E.2d at 197.

Reviewing all of the facts and circumstances, including the number of officers present, the officer's statement that Dickerson was free to go, and Dickerson's response, the Supreme Court concluded that "[t]he events of the original encounter resulting in Dickerson's initial detention and release were complete and the ensuing events constituted a new, and consensual, encounter."  Id. at 18, 581 S.E.2d at 197.  Accordingly, the Supreme Court concluded that Dickerson's actions were consensual and that the evidence should not be suppressed.

- 13 -

The similarities between <u>Dickerson</u> and <u>Harris</u> are manifest. Both cases involved a traffic stop initiated by one officer who was soon joined by a backup officer. The traffic stops were both initiated by the officer activating his emergency lights and causing the defendant to pull over in response. There is no indication that any of the officers displayed a weapon (other than simply wearing one) prior to the request for consent. Cf. <u>United States v. Drayton</u>, 536 U.S. 194, 205 (2002) ("The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."). In each case, there does not appear to have been any significant physical contact between the officer and the defendant prior to the request for consent. In both cases, the officer had returned identification documents to the defendant prior to asking additional questions.

The only difference of any import is what the officers communicated about the status of the respective investigations. The officer effectively informed Dickerson that the investigation/seizure was over when the officer told Dickerson that he was free to go, but might be subpoenaed for his previous failure to yield the right of way. <u>Dickerson</u>, 266 Va. at 16, 581 S.E.2d at 196. In contrast, the officer not only failed to tell Harris he was free to go, "[t]he officer did nothing to indicate to Harris that he was no longer subject to detention for a traffic violation." <u>Harris</u>, 266 Va. at 33, 581 S.E.2d at 210.

Applying the logic of these cases to the instant case reveals that Yen's encounter with the officer falls somewhere in between the two. Although the case shares the similarities of <u>Dickerson</u> and <u>Harris</u> regarding the initial traffic stop, the use of emergency lights to effectuate

- 14 -

that stop,[6] the display of weapons by the officer, the arrival of a backup officer, the lack of any significant physical contact, and the return of all identifying documents, it differs from both in what the officer communicated to Yen at the end of the initial investigation.

Unlike the circumstances in Dickerson, the officer never expressly informed Yen he was free to leave. However, unlike the situation in Harris, Yen was aware that the officer had concluded his investigation. Prior to seeking consent to search, the officer had given Yen the warning ticket for running the red light and informed Yen that he had sufficiently completed the field sobriety tests, that the officer did not believe Yen was intoxicated, and "that the evaluation for DUI was over."

We find that this case is closer to Dickerson than to Harris. Because the officer indicated to Yen that the investigations related to the initial seizure were over, the officer validly obtained Yen's consent to search both his car and his person. Accordingly, the circuit court erred in granting Yen's motion to suppress.

To hold otherwise effectively would require an officer to inform a citizen explicitly and expressly that, not only had the initial investigation come to an end, but that the citizen was free to go. Although such a bright line rule would be far easier to apply and may better reflect how a citizen might normally interact with a police officer in these situations, such a resolution is foreclosed by the United States Supreme Court's decision in Robinette, which explicitly and expressly rejected just such an approach. See also Harris, 266 Va. at 33, 581 S.E.2d at 210 ("The

---

[6] Yen places great emphasis on the use of emergency lights and the fact that the lights remained on during Yen's encounter with the officer. The use of emergency lights will often be the dispositive factor in determining whether a seizure has occurred. However, when as here, it is undisputed that a seizure occurred and the question is whether the seizure has evolved into a consensual encounter, the use of the emergency lights necessarily takes on less importance. After all, almost all seizures (necessarily including seizures that evolve into consensual encounters) are the result of some show of police authority, whether emergency lights or a verbal command to stop while displaying a badge.

failure to affirmatively inform [the defendant] that he was free to leave does not by itself require a finding that the ensuing encounter was non-consensual." (citing Robinette, 519 U.S. at 39-40)).

CONCLUSION

For the foregoing reasons, we conclude that, under the applicable precedents, Yen validly consented to the search of his person that led to the discovery of the cocaine. Accordingly, we reverse the judgment of the circuit court suppressing the evidence found as a result of the search and remand the case to the circuit court for further proceedings consistent with this opinion.

Reversed and remanded.

Alston, J., concurring in the judgment.

I join the result reached by the very thorough majority opinion but write separately to voice my concern about the analytical framework used to discern whether a "reasonable person" would feel free to leave the scene after the conclusion of an initial encounter with law enforcement. The amorphous concept of the so-called "reasonable person" is not and cannot be an individual trained in the nuances and gradations of constitutional law, particularly within Fourth Amendment doctrine.[7] See New York v. Quarles, 467 U.S. 649, 663-64 (1984) (O'Connor, J., concurring in part and dissenting in part) (recognizing "the hair-splitting distinctions that currently plague our Fourth Amendment jurisprudence"). While the majority finds reconciliation in the jurisprudence, I would suggest that the shades of grey between the result reached by my colleagues in the majority and that reached by the very learned trial judge underscores the dilemma of this case. The two Virginia cases most analogous to the instant case, which address whether an initial seizure has evolved to a consensual encounter, highlight the incongruity of the "reasonable person" standard as it applies in instances such as this. See Dickerson v. Commonwealth, 266 Va. 14, 18-19, 581 S.E.2d 195, 197-98 (2003); Harris v. Commonwealth, 266 Va. 28, 32, 581 S.E.2d 206, 209 (2003).

In applying the facts and circumstances test, the Supreme Court recognized that

> [v]arious factors have been identified as relevant in determining
> whether a seizure has occurred, including the threatening presence
> of a number of police officers, the display of weapons by officers,
> physical contact between an officer and a citizen, an officer's
> language or tone of voice compelling compliance, the retention of

---

[7] The reasonable person belongs to a family of hypothetical figures in law including: the "right-thinking member of society," the "officious bystander," the "reasonable parent," the "reasonable landlord," the "fair-minded and informed observer," the "person having ordinary skill in the art," and stretching back to Roman jurists, the figure of the *bonus pater familias* – all used to define legal standards. While there is a loose consensus in black letter law, there is no accepted technical definition. As with legal fiction in general, it is somewhat susceptible to *ad hoc* manipulation or transformation, and hence the "reasonable person" is an emergent concept of common law.

documents requested by an officer, and whether a citizen was told that he or she was free to leave.

Harris, 266 Va. at 32, 581 S.E.2d at 209.

The majority in our case correctly notes that the only difference of any import between Harris and Dickerson is what the officers communicated about the status of the respective investigations and that applying the logic of these cases to the instant case reveals that Yen's encounter with the officer falls somewhere in between the two.

The majority then concludes that because the officer indicated to Yen that the investigations related to the initial seizure were over, the officer validly obtained Yen's consent to search his car which then legally evolved into a search of Yen's person. I do not necessarily agree that to hold otherwise would effectively require an officer to inform a citizen explicitly and expressly that, not only had the initial investigation come to an end, but that the citizen was free to go. That is not the law, and there are good reasons for that framework. However, "communication" in many instances can be verbal or non-verbal based upon objective criteria or intuitive in nature. My concern is that there is cause for confusion without some plausible definition to figure out first, who the "reasonable person" is; and second, what are the expectations of this "reasonable person" in instances such as these.[8] For example, consider the "reasonable person" who pursues the admirable course of compliance and cooperation with law enforcement, yet operates under a misperception of the legal niceties of the encounter. Indeed, an incorrect assessment may create the possibility for other criminal liability in the nature of

---

[8] Academics have endeavored to trace the origins and fundamentals of the concept, and have reached disturbing conclusions about its practical applications. See Susan F. Mandiberg, Symposium: Who is the Reasonable Person? Reasonable Officers vs. Reasonable Lay Persons in the Supreme Court's Miranda and Fourth Amendment Cases, 14 Lewis & Clark L. Rev. 1481, 1536 (2010) ("[T]he Court frequently . . . allows the reasonable officer to be all too human, indeed often flawed, but requires the reasonable lay person to be a paragon of astute awareness, control of emotions, and sacrifice for the greater good.").

obstruction of justice or the like should this "reasonable person" choose to improvidently terminate the encounter.  Worse than a Hobson's Choice, this is a choice of potentially yet almost unavoidably dire circumstances if one chooses wrong.